Present:  All the Justices

RUSSELL WAYNE HUNDLEY

v.  Record No. 971899  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    June 5, 1998
PATSY JEAN OSBORNE

FROM THE CIRCUIT COURT OF HENRY COUNTY
Martin F. Clark, Jr., Judge

In this appeal, we decide whether the circuit court erred by setting aside a jury verdict in the amount of $125,000 in favor of Patsy Jean Osborne[1] on the basis that the verdict was inadequate as a matter of law and by ordering Russell Wayne Hundley to pay Osborne $240,000 or submit to a new trial.  Because we find that the evidence regarding Osborne's future medical expenses and future loss of wages is subject to differing interpretations and thus is controverted, we will reverse the judgment of the circuit court.

I.

On December 21, 1992, a truck driven by Hundley collided head-on with a car in which Osborne was a passenger.  As a result of the accident, Osborne sustained several injuries that required medical treatment.

---

[1]  Throughout the record, the appellee's name is spelled "Osborne" and "Osbourne."  We are using the spelling which appears in our order awarding an appeal in this case.

Specifically, Osborne fractured her coccyx, sternum, and three of her ribs.  She also sustained a sprained left ankle and a soft tissue injury to her right knee.

Osborne filed suit against Hundley, who admitted liability, and a jury trial was held on the issue of damages only.[2]  In regard to that issue, two of Osborne's treating orthopedic surgeons, Dr. Karl Thomas Wagner, Jr., and Dr. Robert Samuel Widmeyer, testified via deposition concerning their respective treatment of Osborne as well as their prognosis about the future medical treatment Osborne would need.  Dr. Wagner, who first saw Osborne on December 28, 1992, testified that he treated Osborne's injuries with physical therapy, anti-inflammatory medications, and exercise.  Dr. Wagner reported that throughout Osborne's course of treatment, she continued to have pain and tenderness in her right knee and that it was "by far the worst problem."  Nevertheless, Dr. Wagner anticipated that Osborne would make "a complete recovery" from her injuries and stated that she did not have "any permanent disability relating to her ankle, related to her coccyx, related to her ribs or related to her sternum."  As of April 14, 1993,

---

[2]  Hundley stipulated that Osborne had incurred past medical expenses totaling $12,081.47.

Dr. Wagner released Osborne to return to work without any restrictions on her activities.

Osborne was referred to Dr. Widmeyer in March 1995 after she continued to experience tenderness in her right knee as well as residual pain around her sternum. Dr. Widmeyer testified that Osborne suffers from localized soft tissue problems in her right knee for which he has prescribed physical therapy, anti-inflammatory medications, and periodic cortisone injections.[3] While Dr. Widmeyer stated that Osborne's condition was not "crippling" or "dangerous," he did opine that it was "painful" and that "her ability to do what she used to do is half what it was." Thus, according to Dr. Widmeyer, Osborne's right knee injury "doesn't look like its going to go away by anything . . . tried so far." Finally, Dr. Widmeyer concluded that Osborne's need for future medical treatment for her knee would likely continue at the same rate. He stated that Osborne goes to the doctor only when "she's

---

[3] Dr. Widmeyer initially stated that he had given Osborne at least seven to ten cortisone injections and that Osborne usually had to miss some time at work when her pain became severe enough to require an injection. However, on cross-examination, Dr. Widmeyer admitted that he had injected Osborne with cortisone only five times during a span of approximately three years.

flared up, she comes more frequently until the flare-up settles down . . . ."

Osborne, as well as her friends and family, testified regarding the effect of Osborne's injuries on her job performance and personal life. Osborne returned to her job on April 15, 1993. Her position as a "maurata" machine operator is physically demanding and frequently requires her to lift and carry bolts of fabric called "cheeses," which weigh ten pounds each. Several times during a regular shift at work, Osborne loads 54 of these "cheeses" onto a pin truck and then pushes the truck to another part of the plant. Because of the strenuous nature of her job, Osborne often experiences pain in her right knee, and she has missed work when the pain became severe enough that she needed an injection of cortisone.[4] Even though a co-worker occasionally has had to assist Osborne with her job duties, Osborne has received two raises along with a four percent bonus since the accident. In regard to her personal life, Osborne seldom engages in activities that she used to

---

[4] Osborne claims that from December 1992 to February 1997, she incurred $9,510.18 in lost wages. However, the record is unclear whether Osborne's lost wages were entirely attributable to her injuries or due, in part, to reasons unrelated to the accident.

enjoy, such as dancing, camping, and walking, because these activities now cause her to suffer knee pain.

Following its deliberations, the jury returned a verdict in favor of Osborne in the amount of $125,000. Osborne then moved the court to set aside the verdict and asked for a new trial or, in the alternative, additur. After considering the briefs and arguments by both parties, the circuit court determined that the jury verdict was inadequate as a matter of law and ordered Hundley either to pay Osborne $240,000 or to submit to a new trial.[5]

In nearly doubling the amount of the jury's verdict, the circuit court focused on the evidence pertaining to Osborne's future medical expenses and future loss of wages. In its letter opinion, the court first found uncontradicted evidence that Osborne averaged $2,300 a year in medical expenses from March 1995 through December 1996 for treatment of her knee injury and that she would continue to incur expenses at the same rate in the future.[6]   Thus, the

---

[5]   Our recent decision in Supinger v. Stakes, 255 Va. 198, 495 S.E.2d 813 (1998), does not affect the instant case.  Counsel for Osborne, in the proceedings below, requested the circuit court to use additur.

[6]   The record on appeal contains no testimony that Osborne averaged $2,300 for medical expenses from March 1995 through December 1996 for treatment of her knee injury.

circuit court multiplied the average yearly incurred medical expenses times Osborne's life expectancy of 36.9 years and concluded that Osborne would incur $84,870 in future medical expenses.

The court next found uncontradicted evidence that Osborne would continue to incur wage losses as a result of her knee injury. In determining the amount of such future losses, the circuit court averaged the wages Osborne lost from 1994 to 1997 and then multiplied that average by 22 years, Osborne's estimated remaining work expectancy.[7] The court then found that plaintiff had demonstrated damages of $25,883 in future loss of wages.

In sum, the court concluded that Osborne had proven "$12,081.47 in past medical expenses, $84,870.00 in future medical expense, $9,510.18 in past lost wages and $25,883.00 in future lost wages, an aggregate amount of $132,344.65, making the $125,000.00 jury verdict inadequate as a matter of law."[8] Hundley accepted the additur under

---

[7] Implicit in the circuit court's calculation is the assumption that the lost wages incurred by Osborne during these years were entirely attributable to her knee injury. However, as stated previously, the record before this Court lacks any specific evidence attributing all of Osborne's lost wages to her injuries.

[8] The jury's verdict of $125,000 arguably included more than $100,000 for damages such as physical pain, mental anguish, future medical expenses, and future loss of

protest and, pursuant to Code § 8.01-383.1(B), sought to have the judgment reviewed on appeal.

II.

The dispositive issue in this appeal is whether the jury's verdict is inadequate as a matter of law because the jury did not award a sufficient amount to Osborne for future medical expenses and future loss of wages. Resolution of this issue turns on whether Osborne's evidence of future medical expenses and loss of wages was uncontroverted.

We stated in Bradner v. Mitchell, 234 Va. 483, 487, 362 S.E.2d 718, 720 (1987), that when a plaintiff's evidence of special damages "is uncontroverted and so complete that no rational fact-finder could disregard it . . . it must be considered as a fixed, constituent part of the verdict."  See also Davoudlarian v. Krombein, 244 Va. 88, 91, 418 S.E.2d 868, 870 (1992).  However, we also stated that when "the plaintiff's evidence of special damages is controverted, doubtful as to nature and extent . . . then neither the circuit court nor we, on appeal, can say that the plaintiff's special damages constituted any fixed part of the jury's verdict."  Bradner, 234 Va. at

_____

wages because Osborne's past medical expenses and lost wages totaled only $21,591.65.

7

487, 362 S.E.2d at 720-21.[9]  In the latter situation, "the verdict cannot be disturbed on a claim of inadequacy."  Id. at 488, 362 S.E.2d at 721.

In the present case, we cannot say that Osborne's evidence regarding future medical expenses and loss of wages "is uncontroverted and so complete that no rational fact-finder could disregard it."  Id. at 487, 362 S.E.2d at 720.  With regard to future medical expenses, Dr. Widmeyer testified that Osborne's need for future medical treatment for her knee would likely continue at the same rate.  He further stated that Osborne characteristically has not sought medical treatment until she has experienced an exacerbation of the pain in her knee.  The circuit court interpreted this testimony to mean that Osborne would continue to incur medical expenses for treatment of her knee pain at the same actual rate at which she had incurred medical expenses from March 1995 through December 1996.  However, this interpretation is only one possible construction of Dr. Widmeyer's testimony.  The jury could have reasonably concluded that Osborne will need some treatment for her knee pain in the future but not

---

[9]  The rule enunciated in Bowers v. Sprouse, 254 Va. 428, 492 S.E.2d 637 (1997), is not applicable to the present case because the verdict at issue is not for the exact amount of Osborne's special damages.

8

necessarily at the same rate for the next 36.9 years of her life. Furthermore, the record before us does not demonstrate that Osborne incurred a yearly average of $2,300 for medical expenses from March 1995 through December 1996 solely because of her knee injury.

The circuit court conducted a similar analysis of Osborne's evidence regarding her future loss of wages. Because Dr. Widmeyer testified that Osborne's residual knee problem will remain constant over time, the circuit court concluded that Osborne would suffer wage losses in the future at the same average rate at which she had incurred such losses from 1994 to 1997. However, the record is unclear whether all the time that Osborne missed from work during those years was directly attributable to her knee injury. In fact, she did not receive treatment from Dr. Widmeyer until March 1995 at which time she initially complained about pain in her right knee and sternum.

Accordingly, we conclude that the circuit court erred in setting aside the jury's verdict. "Great respect is accorded a jury verdict, and it is not sufficient that a trial judge, had he been on the jury, would have rendered a different verdict." Hall v. Hall, 240 Va. 360, 363, 397 S.E.2d 829, 831 (1990). When "reasonably fairminded [persons] may differ as to the conclusions of fact to be

9

drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony," then such evidence is controverted, and the jury's verdict cannot be disturbed either by the circuit court or this Court.  Id. (quoting Forbes & Co. v. Southern Cotton Oil Co., 130 Va. 245, 259, 108 S.E. 15, 19 (1921)).

For these reasons, we will reverse the judgment of the circuit court, reinstate the verdict of the jury, and enter final judgment on the verdict.

Reversed and final judgment.